IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:03-HC-966-H

JOHNNY STREET PARKER,                )
                                     )
                Petitioner,          )
                                     )
                                     )        O R D E R
                                     )
GERALD BRANKER, Warden,              )
Central Prison, Raleigh,             )
North Carolina,[1]                   )
                                     )
                Respondent.          )

This matter is before the court on the petition for writ of
habeas corpus, filed pursuant to 28 U.S.C. § 2254, on behalf of
Johnny Street Parker ("Parker" or "the petitioner"). The
respondent has answered the petition and moved for summary
judgment. The petitioner has responded, and the matter is ripe
for ruling.

STATEMENT OF THE CASE

A. Facts

Petitioner Parker was convicted of two counts of first-degree
murder and sentenced to death for the murders of James William
Buchanan and Jerry Lee Dowdy. The following facts are summarized
from the opinion of the North Carolina Supreme Court affirming

---

[1] Marvin Polk, former Warden of Central Prison, was named as
respondent in the petition. Since the petition was filed, Gerald
Branker replaced Polk as Warden and has been substituted as the
respondent. See Fed. R. Civ. P. 25(d).

Parker's convictions and sentences, see State v. Parker, 350 N.C. 411, 516 S.E.2d 106 (1999), and the transcript of the trial.

On the morning of October 2, 1994, Billy Herring, the chief of the Roseboro Fire Department, received a report that smoke was coming from a house located at 201 Northeast Street in Roseboro, North Carolina. Responding to the scene, firemen found the bodies of James Buchanan and Jerry Dowdy. Buchanan, known as "Alabama," lived in the downstairs apartment in the house, and Dowdy lived in the upstairs apartment. Buchanan was found on the bed in his downstairs apartment. He had been shot in the face and his body and the bed were burning.[2] Dowdy was found face down in a puddle of blood on the kitchen floor of his upstairs apartment. He was naked from the waist down and his testicles had been removed.[3] He suffered multiple chopping wounds to his head and hands, and blunt force trauma to his head. Officers found blood and hair on an ax in the kitchen and a bloody knife on the kitchen floor. They also found an empty wallet under Dowdy's left elbow.

Mitchell Parker, the petitioner's cousin, testified at trial. Mitchell explained that he and the petitioner were together on October 2, 1994, the night after the murders, and the petitioner

---

[2] Buchanan's nine millimeter gun, usually kept on his nightstand, was missing from the scene and never located. Forensic evidence later indicated that Buchanan's wounds were inflicted by a gun consistent with the missing nine millimeter.

[3] Dowdy's testicles were found on the floor in the doorway to the downstairs area of the house.

confessed to committing the murders. The petitioner told Mitchell that he knew Buchanan kept a gun in his house and he had gone there to steal it. He said that while he was stealing the gun, Buchanan woke up and grabbed him. The petitioner said he shot Buchanan to get him off of him. Dowdy heard the noise and came downstairs. The petitioner said that they got in a fight and he "busted" Dowdy's head with a hammer. The petitioner said he decided to burn the house. He changed clothes, cut some phone lines at a nearby house, and stole a lawnmower. The petitioner told Mitchell that earlier on the day of the crimes he had smoked marijuana, injected cocaine several times, and consumed beer.

The petitioner was arrested on October 5, 1994, for the murders of Buchanan and Dowdy. He initially denied going into the victims' house. However, he admitted to the police that he had stolen a lawnmower and battery charger from a shed near Buchanan's house and had stolen a cellular phone from Buchanan's car. Buchanan's phone was not located by the police, but the phone records show a one-minute call was made from the phone to the home of the petitioner's uncle at 5:25 a.m. on Sunday October 2, 1994. The petitioner admitted calling his uncle's house from Buchanan's phone.

When the police told the petitioner that his cousin Mitchell said the petitioner had confessed to committing the crimes, the petitioner started crying and asked for a lawyer. The police

3

stopped questioning him and he was handcuffed and taken to a police car. While outside by the police car, the petitioner asked how serious the situation was. The officer told him it was bad and the petitioner said "I didn't mean to kill Alabama."

At trial, Betty Edwards, who lived near the victims' home, testified that on October 2, 1994, she discovered that a battery charger, an electric heater, and some other items had been removed from her storage shed. She also testified that someone had gone in her son's car and rifled through papers.

James Jackson, who lived next door to the victims' home, testified that on October 2, 1994, he found the phone lines had been cut at his house, a storm window under the garage had been removed, and a lock had been pried off of a storage building. An expert for the State testified that three finger prints lifted from the storm window were a match to the petitioner.

Several witnesses testified that as late as 4 a.m. on October 2, 1994, the petitioner was wearing a dark green pullover with black stripes over a multi-colored shirt and gray stone-washed jeans that had a tear and a spot of orange paint on them. When the petitioner arrived at Mitchell Parker's house several hours later, at around 9 a.m., he was wearing gray dress slacks and a pair of black and white Asics tennis shoes.

Evidence was offered by the State showing that a dark green shirt with black stripes seized from the petitioner's car had blood

4

on it that matched the DNA banding of Dowdy and the petitioner. The State also offered evidence that jeans matching the ones the petitioner was seen wearing on October 2nd were found on Dowdy's bed with blood on them consistent with Dowdy's DNA. A shoe impression found in blood in the hallway of Dowdy's upstairs apartment matched an impression from the Asics tennis shoes the petitioner was wearing when he arrived at Mitchell Parker's house the morning after the murders. Forensic tests indicated that blood on the shoes was human blood.

B. Procedural History

On October 31, 1994, the petitioner was indicted for the first-degree murders of James Buchanan and Jerry Dowdy. On July 22, 1996, he was indicted for one count of malicious castration, one count of arson, two counts of breaking and entering, two counts of breaking and entering a motor vehicle, and three counts of larceny.

After trial, the jury found him guilty of the first-degree murder of James Buchanan on the basis of felony murder and found him guilty of the first-degree murder of Jerry Dowdy on the basis of felony murder and premeditation and deliberation. The jury also found the petitioner guilty of malicious castration, first-degree arson, first-degree larceny of a home and larceny of a firearm therefrom, breaking or entering a motor vehicle, first-degree burglary of an apartment, felonious breaking or entering of a storage building and felonious larceny therefrom, and breaking or entering of a motor vehicle and misdemeanor larceny therefrom.

5

After a sentencing hearing, the jury found four aggravating circumstances in the case of the murder of James Buchanan: 1) the murder was committed while the defendant was engaged in the commission of arson; 2) the murder was committed while the defendant was engaged in the commission of another homicide; 3) the murder was committed for pecuniary gain; and, 4) the murder was part of a course of conduct in which the defendant was engaged and which included the commission by the defendant of another crime of violence against another person. The jury found three aggravating circumstances in the case of the murder of Jerry Dowdy: 1) the murder was committed by the defendant while the defendant was engaged in the commission of arson; 2) the murder was committed by the defendant while the defendant was engaged in flight after committing another homicide; and, 3) the murder was especially heinous, atrocious, or cruel. In each case the jury found that the aggravating circumstances outweighed the mitigating circumstances and recommended the death penalty. Accordingly, the trial court sentenced the petitioner to death on each count of first-degree murder. The court arrested judgment on the larceny of a firearm conviction and continued prayer for judgment on two counts of breaking or entering and one count of misdemeanor larceny. For the remaining related convictions the court imposed consecutive terms of imprisonment.

On direct appeal, the North Carolina Supreme Court found no error and affirmed the petitioner's convictions and sentences.

6

<u>Parker</u>, 350 N.C. at 449, 516 S.E.2d at 131. The United States Supreme Court denied certiorari. <u>Parker v. North Carolina</u>, 528 U.S. 1084 (2000). Parker filed a motion for appropriate relief ("MAR") in Sampson County Superior Court on September 6, 2000. On October 26, 2000, Parker filed an Amendment to MAR which added seventeen affidavits in support of his MAR. On November 2, 2000, Parker filed a Second Amendment to MAR which added four affidavits in support of his MAR. On November 8, 2000, Parker filed a Third Amendment to MAR which added four more affidavits in support of his MAR. Finally, on February 27, 2001, Parker filed a Fourth Amendment to MAR which added two affidavits in support of his MAR. The State filed a response to the MAR and Parker subsequently filed a reply. In an order dated December 29, 2002, the MAR court denied Parker's MAR.[4] <u>See</u> MAR Order, State Court Record, Vol. 22 of 22, Tab 21. On May 22, 2003, Parker filed a petition for writ of certiorari with the North Carolina Supreme Court. The state court denied petitioner's request. <u>State v. Parker</u>, 357 N.C. 468, 587 S.E.2d 64 (2003).

On December 24, 2003, Parker filed a petition for writ of habeas corpus with this court. After an initial review of the petition, the court dismissed Claim E without prejudice and directed the respondent to file an answer to the remaining claims.

_____

[4] The MAR court did not hold an evidentiary hearing on any of the claims.

7

On May 7, 2004, the respondent filed an answer to the petition and a motion for summary judgment. The petitioner filed a response to the motion for summary judgment and subsequently, a supplemental memorandum in support of the petition. On January 29, 2008, the court held an evidentiary hearing with respect to the petitioner's claim that evidence was withheld in violation of <u>Brady v. Maryland</u>. The matter is now ripe for ruling.

DISCUSSION

A.   <u>Standard of Review</u>

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986). The court's review of Parker's claims is governed by 28 U.S.C. § 2254(d), as modified by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104, 132, 110 Stat. 1214 (1996). Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

8

28 U.S.C. § 2254(d).

The phrase "'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decisions." Williams v. Taylor, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 412-13. A state court decision "involve[s] an unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Only after a petitioner establishes that the state court's adjudication of his claims was "contrary to" or an "unreasonable application of" clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence,

9

may a federal court proceed to review a state court judgment independently to determine whether habeas relief is warranted. Rose v. Lee, 252 F.3d 676, 689-90 (4th Cir. 2001). If the state court did not articulate the rationale underlying its adjudication, a federal habeas court must examine the record and the clearly established Supreme Court precedent to determine whether the state court's adjudication was contrary to, or involved an unreasonable application of, clearly established federal law. Bell v. Jarvis, 236 F.3d 149, 158 (4th Cir. 2000). The factual findings of the state court are presumed to be correct. 28 U.S.C. § 2254(e)(1). The petitioner bears the burden of rebutting this presumption by clear and convincing evidence. Fisher v. Lee, 215 F.3d 438, 445 (4th Cir. 2000).

B. Claims[5]

Parker maintains his convictions and sentences are in violation of his constitutional rights in the following respects:

Claim A - The State withheld exculpatory evidence in violation of Brady v. Maryland;

Claim B - The petitioner received ineffective assistance of counsel because counsel failed to adequately investigate and present mitigating evidence;

Claim C - The petitioner is entitled to a new trial on the basis of newly discovered evidence;

Claim D - The short-form indictment is constitutionally insufficient;

[5]As previously noted, after an initial review of the petition the court dismissed Claim E without prejudice.

10

Claim F - The indictments were constitutionally deficient because they failed to include the aggravating factors and elements of first-degree murder.

C. Adjudication of the Claims

### 1. Claim A - The State withheld exculpatory evidence in violation of Brady v. Maryland

In Claim A, the petitioner argues that his convictions were obtained in violation of Brady v. Maryland, 373 U.S. 83 (1963). The petitioner asserts that the State withheld the reports of interviews given by Charles Strickland, Jimmy Ezzell, and Captain Ray Powell which contain exculpatory evidence tending to show the responsibility of other persons for the crimes. He also argues the State withheld additional exculpatory evidence including other interview reports, witness statements, investigation reports, photographs, and recordings of interviews.

The respondent agrees that the claim is properly before the court with respect to the petitioner's argument that the State withheld the interview reports of Charles Strickland, Jimmy Ezzell, and Captain Ray Powell. However, he contends that the Brady claim is procedurally defaulted as to all of the other alleged Brady evidence because the petitioner has never before raised those arguments. The court is precluded from reviewing procedurally defaulted claims. See Coleman v. Thompson, 501 U.S. 722, 731-32 (1991). Therefore, the court will first address the argument that many of the petitioner's Brady arguments are procedurally defaulted.

11

a) Procedural Default

The doctrine of exhaustion requires that before a claim may be presented in federal court on habeas review it must be presented to the state courts, giving those courts the first opportunity to consider the claim. Piccard v. Connor, 404 U.S. 270, 275 (1971). A procedural default occurs when a habeas petitioner has failed to exhaust a claim in state court and the state court would now find the claim procedurally barred. Coleman, 501 U.S. at 735 n.1; see also Gray v. Netherland, 518 U.S. 152, 161-62 (1996); Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1990). Procedurally defaulted claims can be reviewed if the petitioner demonstrates cause and prejudice, or that the failure to consider the claim will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 750.

The respondent is correct that the petitioner has never before raised Brady arguments relating to: an investigation report of an interview given on October 4, 1994, by Officer Tony Surles; a statement to investigators by Stephanie Boykin; a statement to investigators by Dean Koonce; notes from an initial interview of Ray McClenny; the report of Neil Murphy, the State's expert in fire and arson; photographs taken by SBI Agent Sweated; and, notes and recordings of interviews with the petitioner and Mitchell Parker.

If the petitioner attempted to return to state court to raise these arguments now, he would be procedurally barred from doing so. See N.C. Gen. Stat. § 15A-1419(a). Therefore, these arguments are

12

procedurally defaulted. The petitioner does not assert grounds to overcome the procedural default. Accordingly, the court is precluded from reviewing this portion of the petitioner's claim.

b) The Merits

The petitioner first argued that the interview reports of Charles Strickland, Jimmy Ezzell, and Captain Powell, which suggest others participated in the murders, were withheld in violation of Brady in his MAR.[6] The MAR court denied the claim on the merits. MAR Order at 10-17. In accordance with AEDPA, this court must consider whether the MAR court's adjudication of the petitioner's Brady claim is contrary to, or an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d).

To succeed on a Brady claim, a defendant must show that evidence was suppressed by the State; the evidence was favorable to the defense; and the evidence was material to guilt or punishment. Strickler v. Greene, 527 U.S. 263, 280 (1999). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received

---

[6] The Strickland, Ezzell, and Powell interview reports are located in the State Court Record, Vol. 21 of 22, Tab 14 at 46-53.

13

a fair trial, understood as a trial resulting in a verdict worthy of confidence." <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995).

A prosecutor is obligated under <u>Brady</u> to disclose evidence that might mitigate against imposition of a death sentence. <u>See</u> <u>Brady</u>, 373 U.S. at 87. This could be any of the circumstances of the offense or any aspect of the defendant's character or record. <u>See</u> <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 112 (1982). The State is required not only to turn over admissible evidence, but also evidence that would assist the defense in finding admissible evidence and preparing for trial. <u>Maynard v. Dixon</u>, 943 F.2d 407, 418 (4th Cir. 1991). In considering whether a <u>Brady</u> violation has occurred, the court must consider the cumulative effect of all the evidence alleged to have been improperly withheld. <u>Kyles</u>, 514 U.S. at 436-37.

## Strickland Report

First, the court will address the claim with respect to the Strickland report. The Strickland report summarizes statements Charles Strickland made to the police when he was questioned about a confession he allegedly made to Jimmy Ezzell regarding Dowdy's murder.[7] <u>See</u> State Court Record, Vol. 21 of 22, Tab 14 at 51-53.

---

[7] The report summarizes a police interview on October 21, 1996. Strickland said he remembered Buchanan's death but said he could not remember where he was that night. Strickland stated he was on powerful medications, Lithium and Prolix, for his mental health. Strickland Report at 1. Strickland remembered going to Jimmy Ezzell's on October 18th and 19th 1996, but he did not remember having a conversation about Buchanan's death. <u>Id.</u> at 2.

14

The report reflects that when Strickland was questioned, he told the police he did not remember having a conversation with Ezzell about the murders, did not recall the night of the murders, and suffered from mental health issues which affected his memory.

With respect to the Strickland statement, the MAR court found that there was no Brady violation because the statement had been produced to the defense. The MAR court also found that the report was not favorable to the petitioner because Charles Strickland denied confessing to Ezzell and denied having anything to do with the murders. MAR Order at 11-12.

The petitioner argues that the MAR court's ruling is unreasonable because the evidence shows the defense never received the Strickland report at the time of trial and because the MAR court resolved the factual dispute without an evidentiary hearing. The respondent contends that the MAR court correctly found that the report was produced to the defense at the time of trial.

In support of his MAR, petitioner attached the affidavits of both of his trial attorneys, John Parker and Isaac Cortes, stating

---

Strickland could not remember if he was at Cloniger's the night of the murder. Strickland explained he had been in several institutions and had been given drugs to treat hallucinations. Strickland said the medication he took affected his memory and said he probably would not remember talking to SA Tilley. Id. Strickland said he recalled talking to Parker's attorneys, but was not sure what they talked about. Id.

they had never received the Strickland report.[8]  See Appendix to
Petition for Writ of Habeas Corpus, A-60 and A-61.  In response,
the State provided a copy of a discovery report listing documents
contemporaneously produced with the report, including "statement of
Charles Strickland."  See State Court Record Vol. 20 of 21, Tab 6
at  1.    Despite  this  conflict,  the  MAR  court  concluded  the
Strickland report had been turned over to the defense at the time
of  trial.[9]   Finding  that  the  MAR  court's  ruling  rested  on
conflicting evidence resolved without an evidentiary hearing, this
court held a hearing on the issue on January 29, 2008. With the
benefit of the expanded record, the court is now in a position to
proceed on the claim.

    At the hearing before this court, the respondent introduced a
copy of a discovery report listing the "statement of Charles
Strickland" as a document disclosed to the defense.  The respondent
also introduced evidence showing that throughout the pre-trial
discovery process, the State regularly produced discovery documents
attached to such discovery reports.   Each discovery report was
initialed and dated by one of the defense attorneys to acknowledge
receipt.   Attorney Parker testified that he would not have signed

_____

    [8] Attorney John Parker is not related to the petitioner.

    [9] With respect to all three of the reports, the MAR court
stated that no evidentiary hearing was necessary to resolve the
claim because the issue only involved a question of law.  MAR Order
at 12, 15 17.

16

the discovery reports if he had not received all of the documents purported to be attached and he did not think Mr. Cortes would have either.

In the case of the discovery report listing the "statement of Charles Strickland," the report was initialed and dated as received on December 23, 1996.[10] This date is before the start of the evidentiary phase of trial and well before the trial was concluded in March 1997.[11] The initials indicating receipt of the documents appear to be "IC," for Isaac Cortes. Isaac Cortes was not called to testify at the evidentiary hearing before this court, but co-counsel John Parker testified. When questioned on cross-examination about the initials on the side of the December 23, 1996 discovery report, Parker testified that Mr. Cortes has a unique signature and that he believed the initials to be the signature of Mr. Cortes.

Assistant District Attorney Butler testified that he recalled

---

[10] The date near the initials is December 23, 1996. The date at the bottom of the report appears to be December 23, 1990. It was established at the evidentiary hearing that 1990 was a clear error as the murders did not occur until 1994. While the petitioner disputes that he received the discovery report at the time of trial, he does not dispute that the report date is December 23, 1996.

[11] Jury selection for the petitioner's trial started in October 1996. Prior to the conclusion of jury selection, attorney Parker required open heart surgery and the parties agreed to suspend the proceedings. The jury was subsequently selected on February 7, 1997 and the evidentiary phase began February 17, 1997. See State Court Record, Vol. 21 of 22, Tab 8 at 109.

17

the circumstances surrounding the production of the December 23, 1996 discovery report because it was a little out of the norm. He said the discovery was provided to Mr. Cortes, rather than to Mr. Parker as much of the other discovery had been, because Mr. Parker was recovering from medical treatment. He said that Mr. Cortes came to his office and he allowed Mr. Cortes to compare the State's copy and the copy being produced to the defense. Butler further testified that to his knowledge, the Strickland statement produced on December 23rd is the only statement of Charles Strickland.

In light of the evidence presented after a full and fair evidentiary hearing, the court finds that the record supports the MAR court's determination that the State produced the Strickland report at the time of trial. The documentary evidence presented by the State, bolstered by the testimony at the hearing, is more persuasive than the recollection of trial counsel years after the alleged date of the production. The documents were given to the defense during the period that attorney Parker was recuperating and out of the office. Although Mr. Cortes indicates in his affidavit that he does not recall seeing the statements prior to state post-conviction proceedings, the evidence at the hearing, which Cortes has not disputed, suggests that he signed for receipt of the report and attached documents on December 23, 1996. This contemporaneous acknowledgment of receipt is more reliable than his recollection years after the date in question.

18

As the Strickland report was not improperly suppressed, the petitioner is unable to show that the MAR court's ruling with respect to the Strickland report is an unreasonable application of Brady. Having so determined, the Brady issue only remains with respect to the statements given by Jimmy Ezzell and Captain Powell.

## Ezzell and Powell Reports

The report of Jimmy Ezzell recounts statements Charles Strickland allegedly made to Ezzell in which Strickland confessed to attacking Dowdy with a hammer the night of the murders.[12] See State Court Record, Vol. 21 of 22, Tab 14 at 48-50. The Powell

---

[12] In an interview on October 21, 1996, Jimmy Ezzell told the police that Charles Strickland was at his house on Friday, October 18, 1996. Ezzell said Strickland had either been drinking or smoking pot, and he had a lot of mental problems and was taking medication. He said that when Strickland was off his medication he talks "a lot about wild stuff from outer space." Ezzell Report at 1. Ezzell said that they were watching television and Strickland said he wanted to tell Ezzell about Buchanan. Strickland told Ezzell that Johnny Street Parker had gone to Buchanan's house to steal a gun from Buchanan. Buchanan woke up and Parker shot him. Id. Parker then went to Michael Cloniger's house. Strickland was there with Cloniger. Strickland and Cloniger returned to Buchanan's house with Parker. Strickland said he saw Buchanan dead. Jerry Lee Dowdy came downstairs and Strickland said that he got a hammer and hit Dowdy three or four times, using the handle part. Id. at 2. Ezzell also told the police that Strickland said "they" cut off the "dicks" of both Buchanan and Dowdy and put them in a bag. Strickland, Cloniger, and Johnny Street Parker went over to Bum Spell's residence. He said Parker took off his clothes and took the plastic bag in the water and put the bag under a pipe. Id.

Ezzell told Strickland to turn himself in. Strickland said the police would have to come talk to him and he would not remember then. Id. Ezzell said that Strickland told him the same story the next day, but Ezzell was not sure which details Strickland told him on which day. Id.

19

report summarizes information Captain Powell received from a confidential informant identifying four men plus the petitioner as being involved in the murders.[13] See Id. at 46-47. With respect to the Ezzell and Powell reports, t he MAR court found that the statements were hearsay and would not have been admissible at Parker's trial. MAR Order at 13-16. The MAR court further held that the statements did not constitute Brady evidence because the reports were not favorable or material because they indicated Parker was involved in the murders. Id. at 14, 16. The court held that under the totality of the circumstances, there was not a reasonable probability of a different outcome at either stage of trial if the interview reports had been disclosed. Id.

The petitioner argues that the MAR court's ruling with respect to the Ezzell and Powell reports is unreasonable because the statements provide significant information that there were multiple perpetrators and that someone other than the petitioner killed

---

[13] The informant said a man named Bob Baines was the person with the gun involved in the murders. Powell Report at 1. The informant said Tom Thumb, Billy Monk Faircloth, Clayton Parker, Clayton Parker's son (Mitchell Parker), Johnny Street Parker, and someone by the name of Cloniger were at Cloniger's house right before the murder and all were involved in the murder. The informant claimed that Buchanan was targeted as a victim because he was trying to eradicate drug activity in Roseboro and Baines wanted to continue selling drugs. Id. at 2. The informant also said Clayton Parker and a man named Tom Thumb were with Johnny Street Parker right after the murders. He said Thumb buried the cell phone and the murder weapon on the premises of his uncle, O.T. Hales. Id.

Jerry Dowdy. He also argues that the statements undermine his conviction on the charge of malicious castration. He contends that if he had been able to present evidence of other perpetrators there is a reasonable probability of a different outcome at both phases of trial.

As to the guilt phase of trial, the statements are not favorable or material. As the MAR court found, both statements identify the petitioner as one of the perpetrators and are not inconsistent with the petitioner's guilt. The Ezzell report indicates that the petitioner was responsible for Buchanan's murder and that the petitioner, along with Strickland and Cloniger, were present for the attack on Dowdy. Similarly, the account in Powell's report implicates the petitioner as one of numerous people responsible for the crimes.

Further, given the evidence of the petitioner's guilt there is not a reasonable probability of a different outcome at the guilt phase of trial had the statements been produced. At trial, the State introduced evidence that the petitioner made inculpatory statements establishing himself as a perpetrator in both offenses. The jury heard testimony from the petitioner's cousin, Mitchell Parker, that the petitioner told him he shot Buchanan and "busted" Dowdy's head with a hammer. The State also introduced evidence that the petitioner told the police he was around the victims' home the night of the murders and that he had not meant to kill Buchanan.

21

The petitioner's incriminating statements were corroborated by physical evidence. For example, the State presented evidence that a green shirt found in the petitioner's car had blood on it that matched Dowdy's blood pattern and blood matching the petitioner's blood pattern. Jeans matching the description of the pants the petitioner was wearing the night of the murder were found on Dowdy's bed with blood on them that matched Dowdy's blood pattern. A bloody shoe print found in Dowdy's upstairs hallway was a match to the style and size of Asics sneakers the petitioner was wearing the morning after the murders. Consistent with the petitioner's account to Mitchell, the forensic testimony at trial indicated that Buchanan was shot and Dowdy suffered blunt force trauma to the head which fractured his skull.

Even if the petitioner did not deliver the fatal blow to Dowdy or personally castrate him, the evidence, which implicates him as at least an active participant, amply supports his convictions. Under a theory of acting in concert, if:

> "Persons join in a purpose to commit a crime, each of them, if actually or constructively present, is not only guilty as a principal if the other commits that particular crime, but he is also guilty of any other crime committed by the other in pursuance of the common purpose . . . or as a natural or probable consequence thereof."

State v. Barnes, 345 N.C. 184, 233, 481 S.E.2d 44, 71 (1997) (quoting State v. Erlewine, 328 N.C. 626, 637, 403 S.E.2d 280, 286 (1991)). Under a theory of aiding and abetting, a person is guilty of the underlying offense if:

22

> (i) the crime was committed by some other person; (ii) the defendant knowingly advised, instigated, encouraged, procured, or aided the other person to commit that crime; and (iii) the defendant's actions or statements caused or contributed to the commission of the crime by that other person.

State v. Goode, 350 N.C. 247, 260, 512 S.E.2d 414, 422 (1999).

Moreover, inconsistencies in the statements undermine their usefulness. The accounts of the murders in Ezzell's and Powell's statements cannot both be correct and the statements are irreconcilable with some of the evidence at trial. For example, the Powell statement suggests that the murders were instigated by Bob Baines and that Baines provided the gun used to kill Buchanan. However, at trial the State presented forensic evidence that the gun used to kill Buchanan was Buchanan's gun which he kept next to his bed. Ezzell reported that Strickland told him that they had cut off the penises of the victims, put the private parts in a bag, and concealed the bag at the bottom of a pond. In fact, Buchanan was not injured at all in this manner, and although Dowdy's testicles were removed, they were found at the scene of the crimes.

The potential impact of Ezzell's statement would have been further limited by the fact that Strickland denied any recollection of the night of the murder or the alleged conversation with Ezzell and suffers from mental health issues affecting his memory. Consequently, considering the statements in light of all of the circumstances, the petitioner is unable to show that the statements undermine confidence in the verdicts at the guilt phase of trial.

23

The petitioner is similarly unable to show that the MAR court's ruling is unreasonable with respect to the sentencing phase of trial. The petitioner is correct that, contrary to the MAR court's reasoning, the Ezzell and Powell statements would likely have been admissible at the sentencing phase of trial. The statements, which identify multiple perpetrators and could be used to argue the petitioner was not the primary actor in Dowdy's murder, are potentially mitigating. See Eddings, 455 U.S. at 113 (mitigating evidence can be any of the circumstances of the offense). The Eighth and Fourteenth Amendment require a capital sentencing jury be allowed to consider all relevant mitigating evidence. Lockett v. Ohio, 438 U.S. 586, 604-04 (1978). In keeping with this right, hearsay rules may not be applied 'mechanistically to defeat the ends of justice.'" Jones v. Polk, 401 F.3d 257, 264 (4th Cir. 2005) (quoting Green v. Georgia, 442 U.S. 95 (1979)).

However, this court is not charged with determining whether the MAR court's reasoning is incorrect, but must determine whether the MAR court's conclusion is unreasonable. Id. Even if the statements were favorable and admissible evidence as to the sentencing phase, the petitioner is unable to show that the MAR court acted unreasonably by ruling that the statements were not material. To be material, evidence must not merely raise a possibility of a different verdict, but must raise a reasonable

24

probability of a different verdict. See Strickler, 527 U.S. at
291); United States v. Agurs, 427 U.S. 97, 109-110 (1976). Despite
the petitioner's arguments, the statements do not appreciably
reduce his culpability for the crimes. The evidence in the
statements do not undermine the substantial evidence of the
petitioner's guilt and personal responsibility for the offenses,
but at best indicate there were additional perpetrators.

The petitioner contends that the statements would have allowed
him to ask for a mitigating circumstance to be submitted to the
jury that he was an accomplice or accessory to a capital felony
committed by another and argue his participation was minor. See
N.C. Gen. Stat. § 15A-2000(f)(4)("the defendant was an accomplice
in or accessory to the capital felony committed by another person
and his participation was relatively minor"). Yet, the statements
do little to detract from the evidence that the petitioner was the
sole actor in Buchanan's murder and an active participant in
Dowdy's murder. Even if the petitioner could have shown he was
only one of several perpetrators who killed Dowdy, the evidence
still overwhelming demonstrates he initiated the events leading to
the crimes, shot Buchanan, and attacked Dowdy, crushing his skull
with a hammer. Ultimately, in light of the senseless and savage
nature of the crimes and given the evidence of petitioner's
significant involvement, the alleged Brady evidence does not

undermine confidence in the sentencing verdicts.[14]

Accordingly, the petitioner is unable to show that the MAR court's ruling is contrary to, or an unreasonable application of, clearly established federal law with respect to the guilt phase or the sentencing phase of trial. Respondent's motion for summary judgment as to Claim A is granted.

2. Claim B - The petitioner received ineffective assistance of counsel

In Claim B, the petitioner argues he received ineffective assistance of counsel because his trial attorneys failed to adequately investigate and present mitigating evidence at the sentencing phase of trial. The petitioner argues that when his sisters testified about the emotional, physical, and sexual abuse he suffered growing up, counsel failed to present medical records and other evidence to corroborate their testimony. The petitioner also asserts that counsel were ineffective because they failed to contact his school teachers and failed to present mitigating evidence of his good record from the Bridge Program at the Western Youth Authority in Morganton. Finally, he asserts that counsel

---

[14] The respondent concedes that the Ezzell and Powell reports were not produced at the time of trial, but argues the Ezzell report was discoverable by the defense. Having found the state court was not unreasonable in determining the reports are not material, the court need not address the issue of whether the Ezzell report was suppressed. See Strickler, 527 U.S. at 280 (a defendant must show the evidence was suppressed, favorable, and material to succeed on his claim); United States v. McElhiney, 275 F. 3d 928, 933 (10th Cir. 2001) (even if evidence suppressed and favorable, no Brady violation where evidence not material).

26

failed to contact various family members and neighbors who could have provided testimony about his good character and the abuse he suffered while growing up.

The petitioner first presented this claim in his MAR. The MAR court, citing to N.C. Gen. Stat. § 15A-1419(a)(3), held the claim was procedurally barred because the petitioner was in a position to adequately raise it on appeal, but did not do so. MAR Order at 23. Alternatively, the MAR court held the claim lacked merit. Id. at 24.

The respondent contends that the claim is procedurally defaulted. Under the doctrine of procedural default, a federal court is precluded from reviewing the merits of any claim found to be procedurally barred by the state court on independent and adequate state grounds. Coleman v. Thompson, 501 U.S. 722, 731-32 (1991). In response to the argument that the claim is procedurally defaulted, the petitioner argues that "the time and place to raise a Sixth Amendment claim of ineffective assistance of counsel is not on direct appeal. Accordingly, such claims are not properly disposed of by summary denial pursuant to the procedural bar of G.S. 15A-1419(a)." Petition at 61.

Subsection 15A-1419(a)(3) provides that a motion for appropriate relief must be denied where "[u]pon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so." N.C. Gen.

27

Stat. § 15A-1419(a)(3). Subsection 15A-1419(a)(3) is an independent and adequate basis for procedural default of a claim of ineffective assistance of counsel. See McCarver, 221 F.3d at 589; Williams v. French, 146 F.3d 203, 217-18 (4th Cir. 1998). Contrary to the petitioner's argument, a party is not generally excused from asserting claims of ineffective assistance of counsel on direct appeal. See McCarver, 221 F.3d at 589. The petitioner fails to present any other argument to show that the procedural bar will not support a procedural default of his claim.[15] Therefore, the petitioner's claim is procedurally defaulted.

The petitioner does not argue cause and prejudice to overcome the procedural default or that the failure to consider the claim will result in a fundamental miscarriage of justice. Consequently, the court may not consider the merits of his claim and the respondent's motion for summary judgment as to Claim B is granted.

3.    Claim C - The petitioner is entitled to a new trial on the basis of newly discovered evidence

In Claim C, the petitioner argues he is entitled to a new trial because of what he characterizes as newly discovered

---

[15] The court acknowledges that review on direct appeal is limited to the record on appeal and verbatim transcript. See N.C. R. App. P. 9(a). However, the petitioner does not argue that the procedural default should not apply because his claim could not have been raised on direct appeal because it was based on materials outside of the record. The petitioner only makes the broad argument that claims of ineffective assistance of counsel need not be raised on direct appeal. As noted, this argument has been rejected. McCarver, 221 F.3d 589.

evidence. First, petitioner states that an August 2000 forensic examination of the green shirt he was allegedly wearing the night of the murder indicates the shirt was negative for gunshot residue and nitrates. Second, the petitioner argues that a person named William Bullard told a defense investigator assisting post-conviction counsel that at approximately 3 a.m. on October 2, 1994, he saw Michael Cloniger, Steve McClenny, Ray McClenny, and the petitioner proceeding in the direction of 201 Northeast Street. The petitioner contends this is significant information because it contradicts what Ray McClenny told police about his whereabouts the morning of the murder. He argues that an evidentiary hearing should be held to resolve this claim.

The petitioner first raised this claim in his MAR. The MAR court denied the claim on the merits. The court acknowledged that in accordance N.C. Gen. Stat. § 15A-1415(c), a party may seek a new trial based upon newly discovered evidence. MAR Order at 32-33. The court stated that under North Carolina law there are seven requirements for gaining a new trial based upon "newly discovered" evidence:

> 1. That the witness or witnesses will give newly discovered evidence.
>
> 2. That such newly discovered evidence is probably true.
>
> 3. That it is competent, material, and relevant.

29

> 4. That due diligence was used and proper
> means were employed to procure the testimony
> at trial.
>
> 5. That the newly discovered evidence is not
> merely cumulative.
>
> 6. That it does not tend only to contradict a
> former witness or to impeach or discredit him.
>
> 7. That it is of such a nature as to show that
> on another trial a different result will
> probably be reached and that the right will
> prevail.

Id. at 33-34 (citing State v. Bishop, 346 N.C. 365, 403, 488 S.E.2d

769, 790 (1997); State v. Britt, 320 N.C. 705, 360 S.E.2d 660

(1987)). The burden is on the petitioner to establish all seven

requirements. Id. at 33. The MAR court held that the petitioner

failed to satisfy the test for any of the alleged "newly discovered

evidence." Id. at 34.

With respect to the affidavit of the forensic expert, Don

Paginia, who conducted the forensic test in August 2000, the MAR

court found the affidavit was insufficient to show a new trial was

warranted. The MAR court noted that the petitioner claimed the new

forensic evidence was significant because it undermined the

credibility of Mitchell Parker's testimony. The petitioner argued

that if Mitchell's testimony was accurate as to how the crimes

occurred, gunshot residue would likely have been found on the

petitioner's shirt. The MAR court reasoned that, given this

argument, at best, the new forensic evidence tended only to

contradict a former witness. MAR Order at 35.

30

Moreover, the MAR court noted that when the shirt was tested in August 2000 it was not complete because blood stained areas had been removed before trial for testing by the SBI. The MAR court also said that the affidavit from Paginia failed to address the possible elimination of residue over time. Paginia did not test the shirt until almost six years after the murders and the MAR court, citing to state law, noted that gunshot residue can easily be removed or destroyed. Id. at 34. The MAR court held that the evidence of the petitioner's guilt was overwhelming and the absence of gunshot residue on the shirt nearly six years after the crimes were committed did not establish that a different result would probably be reached at a new trial.

With respect to William Bullard's statement, the MAR court reasoned it did little more than open the door to conjecture that others may have been involved in the crimes. Id. at 36-37. The MAR court noted that "[b]are assertions and mere speculation do not suffice." Id. at 37.

To the extent the petitioner is arguing the MAR court erred in its application of N.C. Gen. Stat. § 15A-1415(c) and the seven factor test, he is not entitled to habeas relief. "It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Claims based on state court rulings on state-law questions are only cognizable on federal habeas review if

they violate specific constitutional provisions or are so egregious they render the entire trial fundamentally unfair. Id.

Further, insofar as the petitioner is arguing that the "newly discovered" evidence shows he is actually innocent and he is entitled to a new trial, he is also unable to show he is entitled to relief. In Herrera v. Collins, 506 U.S. 390 (1993), while stating that, in general, a claim of "actual innocence" based on newly discovered evidence is not a constitutional claim providing grounds for habeas relief, the Supreme Court acknowledged that "[w]e may assume, for the sake of argument in deciding this case, that in a capital case, a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." Id. at 416-17. The Court recognized that "the threshold showing for such an assumed right would necessarily be extraordinarily high." Id. at 417.

The petitioner's argument does little more than ask the court to accept his alternate theory of the events surrounding the crimes and his interpretation of the evidence in the case. However, as the MAR court found, the August 2000 forensic report and statement of William Bullard do not undermine the substantial evidence supporting the petitioner's convictions. Consequently, the petitioner falls far short of any possible showing of actual

32

innocence and also fails to show he is entitled to an evidentiary hearing to develop this claim. See Rector v. Johnson, 120 F.3d 551, 562-63 (5th Cir. 1997). The respondent's motion for summary judgment as to Claim C is granted.

4. Claim D - The short-form indictment is constitutionally insufficient

and

Claim F -The indictments were constitutionally deficient because they failed to include the aggravating factors and elements of first-degree murder

In Claim D, the petitioner argues that the short-form indictments used in his case were constitutionally insufficient because they did not set out all of the elements of first-degree murder and did not set forth any of the aggravating circumstances. In Claim F, the petitioner argues that the short-form murder indictments violated his right to due process under the Fifth and Fourteen Amendments and his rights to notice and trial by jury under the Sixth Amendment. The petitioner first challenged the constitutionality of the short-form indictment in his petition for writ of certiorari filed after his MAR was denied. The petition was summarily denied.[16]

---

[16] The respondent contends that the claim is procedurally defaulted. Although questions of procedural bar are normally resolved first, because the petitioner's claim is clearly without merit, the court has exercised its discretion to proceed directly to the merits. See Bacon v. Lee, 225 F.3d 470, 477 (4th Cir. 2000).

33

In support of these claims, the petitioner argues that the rulings in Ring v. Arizona, 536 U.S. 584 (2002), Apprendi v. New Jersey, 530 U.S. 466 (2000), and Jones v. United States, 526 U.S. 227 (1999), require the State to include all of the elements of first-degree murder and the aggravating factors in the indictments. He asserts that the failure to provide notice of the elements and aggravating circumstances rendered the indictments insufficient and therefore, deprived the trial court of jurisdiction over him.

Due process requires a defendant be informed of the charges against him. See Cole v. Arkansas, 333 U.S. 196, 201 (1948). However, there is no clearly established constitutional requirement that a state indictment allege each and every element of an offense or specify the aggravating circumstances to be relied upon in a capital sentencing proceeding. Nor does Jones, Apprendi, Ring or any other Supreme Court case hold that a state must give advance notice of the aggravating circumstances. Further, in Hartman v. Lee, 283 F.3d. 190, 194 (4th Cir. 2002), the Fourth Circuit addressed and rejected a claim that the petitioner's constitutional rights were violated by the use of the short-form indictment. The Fourth Circuit held that the state court's denial of the challenge to the short-form indictment as unconstitutional was not contrary to, or an unreasonable application of, clearly established federal law. Hartman, 283 F.3d at 199.

Accordingly, the petitioner is not entitled to habeas relief based on these claims and the respondent's motion for summary judgment as to Claims D and F is granted.

## CONCLUSION

For the reasons stated above, the court finds that Parker is unable to establish that he is in custody in violation of the Constitution or laws of the United States. He is not entitled to the relief requested and the respondent is entitled to judgment as a matter of law. Accordingly, the respondent's motion for summary judgment is GRANTED and the petition for writ of habeas corpus is DISMISSED.

This the *31st* day of March 2008.

MALCOLM J. HOWARD
Senior United States District Judge

At Greenville, NC